## Weimer et al. *v.* Bockel, Appellant.

Argued April 26, 1937.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*George M. Spence,* for appellant.

*F. J. Hartmann,* for appellees.

OPINION BY JAMES, J., September 29, 1937:

D. P. Weimer and John M. Bennett, a law partnership, brought an action of assumpsit against J. R. Bockel to recover for legal services rendered by them. Defendant's main defense was that the services were performed for and on behalf of the Majestic Coal Company, of which he was the vice-president. The jury rendered a verdict for the full amount of the claim. Defendant's motions for a new trial and judgment n. o. v. were overruled, and from the judgment entered on the verdict, this appeal was taken.

The assignments of error raise two questions: First, that the evidence was insufficient to warrant the jury in finding that the defendant had made himself personally liable for the services rendered; and, second, the court erred in refusing to charge that under the facts a presumption existed that the defendant was not binding himself but was binding the coal company for payment of the services rendered.

Selecting from the testimony submitted facts most favorable to the plaintiffs, we may summarize them as follows: Defendant owned 85 per cent of the stock of the Majestic Coal Company, the remaining 15 per cent being equally held by other officers of the corporation, to wit: M. R. Brennan, president; J. F. Kauffman, secretary; George Bockel, son of the defendant, treasurer. Sometime in the summer of 1932, John M. Bennett, one of the plaintiff partners, a neighbor and personal friend, was approached by defendant, who informed him that he, the defendant, was likely to be involved in litigation with the Pennsylvania Electric Company and if it came to a head, he would talk to him about it later. In December, 1932, defendant came to the office of plaintiffs and went over the matter with both partners. At this meeting it appeared that the controversy involved a coal-sales contract between the Majestic Coal Company and the Pennsylvania Electric Company. Equity proceedings were thereupon instituted by the plaintiffs on behalf of the Majestic Coal Company, which later, by agreement executed on behalf of the coal company by Bockel as vice-president and attested by Kauffman as secretary, were settled for $17,041. At the direction of Bennett, the check was made payable to the Majestic Coal Company, and was deposited at the Altoona Trust Company at Altoona, in the name of "J. R. Bockel, Special."

With respect to the employment of the attorneys, John M. Bennett testified in part as follows: "Q. You

knew Mr. Bockel was the principal stockholder in the Majestic Coal Company? A. Mr. Bockel told us he was the Majestic Coal Company......Q. You knew at the time you were dealing with a corporation? A. We were dealing with the corporation formally, so far as the papers were concerned, but so far as Mr. Weimer and I were concerned, from the very inception we were dealing with J. R. Bockel. Q. Do you have any writing with Mr. Bockel whereby he agreed to become responsible for the payment of any bill you might have for services in behalf of the Majestic Coal Company? A. No, we deemed it unnecessary. I considered Mr. Bockel at that time to be one of the very best friends I had. Q. But the services you performed were as a matter of fact and as a matter of record services in behalf of the corporation known as the Majestic Coal Company? A. Formally we were representing on the record the Majestic Coal Company; so far as our fee was concerned we were looking to J. R. Bockel at all times......Q. At that time you had no thought but what the Majestic Coal Company would be financially able to pay your bill for services? A. No. Mr. Ogle, Mr. Weimer and I never thought of the Majestic Coal Company as paying our bill; we were looking to Rudy Bockel. No lawyer would have gone through the proceedings in this case without knowing that Rudy Bockel was the Majestic Coal Company......Q. Was he speaking of the Majestic Coal Company or himself as an individual? A. Oh, he knew what he was speaking of and so did I. It was a personal relationship......Q. Who hired you to do the work you have testified to and to render the services you have enumerated here? A. J. R. Bockel......Q. You have said that Mr. Bockel,—that it was Mr. Bockel who arranged for the employment of you and Mr. Weimer to begin this proceeding intended to reform the contract? A. That is true. Q. But you knew it was a contract, not between Mr. Bockel, but the Majestic Coal Company and Associated

Gas and Electric Company? A. No, Mr. Ogle, I didn't, as I told you. Q. As soon as you got into it didn't you know it was a corporation? A. When we got into the matter he told us the Majestic Coal Company was a corporation, but he said 'I am the Majestic Coal Company.'......Q. You prepared that in your office and you knew on that date, which was December 19, 1932, that Rudy Bockel was vice-president? A. At that time I did. When Mr. Bockel first talked to me about it and told me about the possible litigation and the fact he would have to have counsel, there was no understanding that he was an officer of the company or that it was a corporation or anything else. Mr. Bockel always talked about 'his mine.' Q. Because of a little loose talk like that you concluded that he was going to become responsible individually? A. Positively not, Mr. Ogle. Q. For payment of services rendered to a corporation in which he and others were stockholders? A. Positively not. Mr. Bockel employed us individually. He had employed me individually before and had asked me to send the bill to Majestic Coal Company, when Majestic Coal Company didn't have a thing to do with it."

On the same subject of employment, D. P. Weimer testified: "Q. Now, Mr. Weimer, in any conversation, or in any engagement in these matters that you had with Mr. Bockel, did he ever state to you that you were to render the services for the Majestic Coal Company? A. He did not. Q. Who did he say the services were to be rendered for? A. He always talked about the proposition as 'mine.' 'I bought this mine largely to give George a job.' His son George was general manager and maybe some other officer, but it was 'my mine.' ......Q. Now then, at any time that you talked to Mr. Bockel, did he ever say that you were to look for your pay for your services from the Majestic Coal Company? A. He did not. Q. You have already stated he

never said to you that you were to be employed by or on behalf of the Majestic Coal Company? A. He did not; in fact, I didn't know the Majestic Coal Company was in the thing until the papers were brought into the office, which was after he and Mr. Bennett had been together on several occasions, and then they arranged to come in and talk to me......Q. You say he never said to you that you must look to the Majestic Coal Company for payment of your fee for services to be rendered? A. He did not. Q. On the other hand he never said to you that 'I personally will be responsible for this'? A. No, he never in so many words said that. Q. You sort of assumed because in the preliminary talk you had with Mr. Bockel he had loosely referred to it as his property, or whatever terms he used—you naturally assumed that he was the owner of it? A. You are wrong on that. If Bennett had come in to me and said the Majestic Coal Company wanted me to go into litigation for the Majestic Coal Company, I would have wanted to know something about the Majestic Coal Company, but he came in and said, 'I talked to Mr. Bockel last evening and he is going to have some litigation with the Penn Public and wants us to look after his interests.' I said, 'All right, we will be glad to do it.' That was my first information as to who I was going to work for, and in all the conferences after that Bockel talked about 'my mine.' Q. You were all rather loosely referring to the fact it was Bockel's case, his mine and property? A. No, when he said it was his mine, and that he bought it for a position for his son, I felt certain I was working for J. R. Bockel. Q. There wasn't any understanding specifically that Rudy J. Bockel individually, out of his own personal private funds, would make payment for the services which he was seeking you to perform for the Majestic Coal Company? A. Absolutely, that was the way we understood it. That is the reason we said to make the check out to him, 'we are dealing with Rudy Bockel

and he will pay it.' That is the reason we didn't get the check made up to us. Q. It was the Majestic Coal Company for whom the services had been performed? A. Indirectly, yes. We performed services for the Majestic Coal Company on the contract with Mr. Bockel that we should do it. Our contract was primarily with Mr. Bockel. We didn't know whether he was vice-president of the coal company, secretary or treasurer, or whoever he was, or in fact we didn't know he had any part in it. He wanted us to look after this litigation with the Penn Public which involved the Majestic Coal Company."

Another significant fact bearing on the question of the personal employment by Bockel was the deposit of the settlement check to the account of "J. R. Bockel, Special." In the Altoona Trust Company, Bockel had created a large trust fund, among the assets of which was $30,000 of the bonds of the Majestic Coal Company. Two days after the deposit was made, a check for $1,050, to pay interest on the bonds, was drawn upon the special account in favor of Bockel. Within two weeks other checks were drawn upon the account for the purpose of purchasing $12,500 of bonds listed on the New York Stock Exchange, which were deposited in the trust fund, and $12,500 of Majestic Coal Company bonds withdrawn. The Bell-Bockel Company, owned by J. R. Bockel and George Bockel, also received a check for $673.28, for moneys loaned to the coal company.

As thus presented, it was a question of fact for the jury whether the engagement of plaintiffs' services was a personal liability of the defendant. The testimony of the plaintiffs themselves not only established this fact, but when we consider that the greater portion of the settlement fund was appropriated by the defendant to his own use and benefit, it is easy to understand why the jury found for the plaintiffs. As a general principle, officers of a corporation are not liable for the cor-

porate acts and debts of a corporation and are no more to be held liable for the debts or undertakings of the corporation than any other agent for the acts and debts of his principal. They are merely agents of the corporation: 7 R. C. L. §476, page 494; 14A C. J. §1949, page 170. But where it appears that it was clearly the intention of the officer to assume the obligation as a personal liability and that he has been informed that credit has been extended to him alone, there can be no question as to the liability of the officer: 2 Am. Jur., Agency, §315, page 247. If the testimony of the plaintiffs is to be believed, their engagement was a personal employment by the defendant in regard to a corporation, which might be regarded as a one-man corporation, and which was dealt with by the defendant as his own personal business. It is unnecessary for one in dealing with an officer of a corporation, who deals with the transaction as a purely personal one, to give notice to the officer that the credit is extended to him exclusively, but such fact may be inferred from all the circumstances.

Further assigned as error is the refusal of the court to charge that inasmuch as Brennan and Bockel were officers of the company, which fact was known to plaintiffs, a presumption exists that the officers were acting in their representative capacity as agents of the company in giving the employment. In support of his argument, defendant refers to the general rule laid down in 2 Am. Jur., Agency, §315, page 247: "The presumption is that where one known to be an agent deals or contracts within the scope of his authority, credit is extended to the principal alone and the act or contract is his engagement as if he were personally present and acting or contracting. This presumption prevails in the absence of evidence that credit was given to the agent exclusively, the burden of proof being upon the party seeking to charge such agent exclusively." This

rule is undoubtedly sound. However, in the present case the presumption did not prevail, as the evidence did show that credit was given to the agent exclusively, and the only legal burden placed upon the plaintiffs was to submit proof sufficient to satisfy the jury by the weight of the evidence that their contention should prevail. "One bringing action upon a contract has the burden of showing that the other is a party to it. This initial burden is satisfied if the plaintiff proves that the defendant has made a promise, the form of which does not indicate that it was given as agent. The defendant then has the burden of going forward if he wishes to show that his promise was made only as an agent and that this should have been so understood": Restatement, Agency, §320, comment (b). We are of opinion that the court was correct in refusing to charge as so requested.

The assignments of error are overruled and the judgment is affirmed.